UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PERMANENT RESIDENCE, INC., and
GEORGY GAVRILOV,

                              Plaintiffs,           **REPORT AND RECOMMENDATION**

       - v -                                     CV-05-1004 (DLI)(VVP)

RBC VIDEO, INC., YEVGENY
RABINOVICH, VLADIMIR
RABINOVICH, and ALEXANDER
RABINOVICH,
                                 Defendants.
-------------------------------------------------------------x

     This matter was referred by the Honorable Dora L. Irizarry to the undersigned for a

recommendation concerning the defendants' motion for attorney's fees and costs. The

defendants assert that they are entitled to such an award under the Copyright Act, as a sanction

under 28 U.S.C. § 1927, or pursuant to the court's inherent power, because the action was

frivolous from its inception, should never have been filed, and led to a course of objectively

unreasonable litigation.

## I.    BACKGROUND AND PROCEDURAL HISTORY

     The plaintiffs filed this action in February 2005 alleging that the defendants violated the

plaintiffs' copyrights by illegally duplicating and distributing unauthorized DVD copies of the

motion picture "Spy Games: Illegal." What followed was contentious litigation wrought with

allegations of misconduct and fraud. Twice during the course of the litigation the plaintiffs were

required to obtain new counsel following successful applications by their attorneys for leave to

withdraw.

In April 2005, the defendants answered the complaint. Their answer included counterclaims for defamation based on statements made by the plaintiffs' representative, Georgy Gavrilov, during a publicity campaign regarding the defendants' alleged infringement of "Spy Games" which was mounted shortly after the filing of the complaint. *See* Affirmation of Harvey Shapiro ("Shapiro Aff.") ¶¶ 15-16. On July 26, 2005, the court issued an order scheduling an initial conference and establishing deadlines for the parties to provide initial disclosures. *See* Docket Entry (hereinafter "Dkt. Ent.") #12. At the initial conference held on October 12, 2005, the parties represented to the court that initial disclosures had been made, and the court set a schedule for discovery and other pretrial proceedings. *See* Dkt. Ent. #14. Discovery problems quickly emerged, however, and by letter dated February 28, 2006, the defendants requested a court conference to address discovery issues including the plaintiffs' failure to provide initial disclosures which the plaintiffs' counsel had represented had been completed. *See* Dkt. Ent. #18.

At the next court conference, held on April 5, 2006, the court granted the oral application of the plaintiffs' counsel, Oren Warshavsky, Esq., for leave to withdraw effective upon the filing of a notice of appearance by substitute counsel, Julian Lowenfeld, Esq. *See* Dkt. Ent. #22. A revised schedule for the completion of discovery was also entered at that time, including a schedule for addressing motions to the court concerning discovery disputes. *Id.* Mr. Lowenfeld subsequently filed a notice of appearance and replaced Warshavsky as counsel for the plaintiffs. *See* Dkt. Ent. #23.

Discovery difficulties continued notwithstanding the appearance of Mr. Lowenfeld as counsel for the plaintiffs. On April 19, 2006, defendants served discovery requests upon the

plaintiffs concerning the copyright infringement claims. *See* Shapiro Aff. ¶ 26. In addition, the

defendants moved to disqualify Mr. Lowenfeld as counsel for the plaintiffs because of a potential

conflict of interest. *See* Dkt. Ent. #25. When Mr. Lowenfeld did not respond to the defendants'

discovery requests or to the motion to disqualify despite two court-ordered deadlines, *see* Shapiro

Aff. ¶¶ 28, 30, the court scheduled a hearing by Order to Show Cause for June 12, 2006. *See*

Dkt. Ent. #27.

At the hearing on the Order to Show Cause, the court set out a series of deadlines for the

plaintiffs to respond to defendants' discovery requests and disqualification motion. *See* Dkt. Ent.

#28. Plaintiffs again failed to meet the court-ordered deadlines, requiring the defendants once

again to bring the matters to the court's attention on July 5, 2006. *See* Dkt. Ent. #29. Plaintiffs

eventually did file opposition to the defendants' motion. *See* Dkt. Ent. #30. By order dated July

26, 2006, the court denied the defendants' motion to disqualify Mr. Lowenfeld, but admonished

plaintiffs for their behavior. *See* Dkt. Ent. #33.

Following the July 26 order, the plaintiffs finally began to comply with discovery

obligations. The production made at that point included copies of numerous documents

purported to be copyright registrations and acquisition records for "Spy Games." *See* Shapiro Aff.

¶ 35. When the plaintiffs then produced Mr. Gavrilov for a deposition on October 30, 2006, *id.*

¶ 37, the validity of those documents came into serious question. The defendants had requested

that Gavrilov produce the original copyright registrations on a number of occasions before the

deposition. *Id.* ¶ 38. When he did not produce them at the deposition, the defendants

suspended the deposition and insisted that he retrieve the original documentation. *Id.* Gavrilov

complied, but returned with only one original registration which bore a registration date of May

10, 2005, even though the infringement allegedly began in January 2005. *Id.* ¶ 38, Exh. A. The copyright registrations the plaintiffs had produced before the deposition bore dates earlier than May 2005. *Id.* ¶¶ 40-41, Exh. B & C. As explained more fully below, these discrepancies created serious problems for the plaintiffs' claims.

Other events at the deposition posed additional problems for the plaintiffs' claims as well. Mr. Gavrilov testified at his deposition that a series of documents relating to the plaintiffs' rights in "Spy Games" were transmitted via e-mail. *Id.* ¶ 44. Because no such e-mails had ever been provided by the plaintiffs despite the defendants' requests, the defendants adjourned Gavrilov's deposition pending their production. *Id.* In further default of the plaintiffs' discovery obligations, the witness who the plaintiffs allege purchased the infringing DVD from the defendants, one Alexei Soen, was also supposed to be deposed along with Gavrilov but failed to appear. *Id.* ¶ 45. Given the various events that occurred that day, immediately after the deposition adjourned Mr. Lowenfeld agreed that the action should be dismissed. *Id.* ¶ 46.[1]

The defendants then wrote to the court on November 1, 2006 requesting that the case be dismissed and that the plaintiffs be held in contempt. *See* Dkt. Ent. #36. Mr. Lowenfeld responded to this application by requesting to be relieved due to a conflict of interest. *See* Dkt. Ent. #37. The court granted Mr. Lowenfeld's motion to withdraw on November 16, 2006, and

---

[1] In a declaration submitted in opposition to defendants' motion, Gavrilov concedes that the registration of the copyright was not official until May 10, 2005. *See* Declaration of Georgy Gavrilov ("Gavrilov Decl.") ¶ 3. However, he also contends that an earlier application was filed on January 19, 2005 with the Copyright Office. *Id.* ¶¶ 4-6. Gavrilov also asserts that due to a language barrier, and a hostile environment at his deposition, there may have been some confusion as to his true testimony. *Id.* ¶¶ 7-10. In addition, he states that he was never given a copy of his deposition transcript to correct any testimony. *Id.* ¶ 7. The defendants did not submit a copy of the transcript in connection with the instant motion.

ordered the completion of depositions on November 30 and December 1, 2006.  *See* Dkt. Ent.

#43.  A third, and final, attorney, David Hoffman, filed a notice of appearance for the plaintiffs

on November 27, 2006.  *See* Dkt. Ent. #44.

With the consent of defense counsel, Mr. Hoffman requested and was granted an

extension of time to complete the court-scheduled depositions.  *See* Dkt. Ent. #45.  The parties

began to engage in settlement discussions leading to an apparent settlement in principle on

December 4, 2006.[2]  *See* Shapiro Aff. ¶ 53.  On that same day, Mr. Shapiro faxed and mailed a

letter to Mr. Hoffman confirming the terms of the settlement, and on December 11, 2006 he sent

Mr. Hoffman a copy of the stipulation to be filed with the court.  *Id.* ¶¶ 54-55, Exh. G.  Based

upon this understanding, on December 18, 2006 the parties jointly requested, and were granted,

an adjournment of the next status conference with the court from December 20, 2006 until

January 24, 2007.  *See* Dkt. Ent. #47.  On January 23, 2007, however, Mr. Hoffman telephoned

defense counsel and advised him that the plaintiffs had changed their minds, and wanted to

proceed with the case.  *See* Shapiro Aff. ¶ 58.

The defendants promptly moved, with Judge Irizarry's permission, to enforce the

settlement.  Dkt. Ent. #56.  After briefing and oral argument, Judge Irizarry ruled that the

parties had indeed agreed on the settlement terms set forth in the stipulation that had been

prepared by Mr. Shapiro, and granted the defendants' motion to enforce the settlement

---

[2]At about the same time Mr. Hoffman wrote to Judge Irizarry requesting a pre-motion conference in order to voluntarily dismiss the action, *see* Dkt. Ent. #46, but because a pre-motion conference was not required for voluntary dismissal, the application was denied.

agreement entered into by the parties.[3]  Dkt. Ent. #68.  In addition, since the settlement

stipulation contemplated that the defendants could move for attorney's fees and costs, Judge

Irizarry set a deadline for such a motion.  *Id*.  The defendants' timely motion for attorney's fees

and costs was made shortly thereafter, and referred to me for a report and recommendation.

Dkt. Ent. #69 and Dkt. Ent. dated 2/14/2008.  Evidentiary hearings concerning the fee

application were thereafter held on November 25 and December 18, 2008.  Dkt. Ents. #89, #93.

On the basis of the submissions and all proceedings concerning this matter, the court makes the

recommendation below.

## II.    DISCUSSION

The defendants have articulated three independent bases upon which they argue the

court may make an award to them for their attorney's fees and costs in this litigation: the fee

shifting provisions of the Copyright Act, the sanctions authorized by 28 U.S.C. § 1927, and the

court's inherent power to control abusive litigation tactics.  Each basis is examined below.

### A.    COPYRIGHT ACT

Under the Copyright Act,

> In any civil action under this title, the court in its discretion may allow the
> recovery of full costs by or against any party other than the United States or an
> officer thereof. Except as otherwise provided by this title, the court may also
> award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505.

---

[3]While the motion was *sub judice*, the plaintiffs file a second, related action – *Permanent Residence, Inc. v. RBC Video, Inc., et al.*, 07 CV 3264 (DLI) – and requested that the two matters be consolidated. That request was denied in view of the dismissal of the instant action.

Section 505 of the Copyright Act is one of several federal statutes that override the normal "American" rule that a party pays its own attorney's fees. Recently, however, in *Buckhannon Bd. and Home Care v. W. Va. Dept. of Health and Human Serv.*, 532 U.S. 598, 605 (2001), the Supreme Court held that for purposes of such statutes, a party is not a "prevailing party" where it has failed to secure a judgment on the merits or a court-ordered consent decree. To be considered a prevailing party, there must be a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon*, 532 U.S. at 605; *see also Union of Needletrades, Industrial and Textile Employers v. United States Immigration and Naturalization Serv.*, 202 F. Supp. 2d 265, 280 (S.D.N.Y.2002) (holding that, in light of *Buckhannon*, "the notion of a litigant 'prevailing' for the purposes of the fee-shifting statutes must be understood to demand some success on the merits incorporated in a judgment or other judicial decree.") (emphasis added). "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change." *Id.* at 605.

Although *Buckhannon* concerned the fee-shifting provisions of the Fair Housing Amendments Act of 1988 and the Americans with Disability Act of 1990, it is clear that *Buckhannon* applies with equal force to the fee-shifting provision of the Copyright Act at issue here. *See, e.g.*, *Buckhannon*, 532 U.S. at 602-03 & n. 4; *J.C. v. Reg'l Sch. Dist. 10, Bd. of Educ.*, 278 F.3d 119, 124 (2d Cir. 2002) (acknowledging broad application of Supreme Court precedents in decisions concerning attorney's fee awards under various federal fee-shifting statutes). Here, of course, there has been no judgment on the merits or consent decree endorsed

by the court.[4]  Nor has there been a judicially sanctioned change in the relationship among the parties.  The settlement stipulation simply dismisses with prejudice all claims made by the parties against each other, and reserves to the defendants the right to make an application to the court for attorney's fees.

The defendants nevertheless argue that the Second Circuit has liberally interpreted *Buckhannon's* definition of a "prevailing party."  They rely primarily on *Williamsburg Fair Housing Committee v. New York City Housing Authority*, No. 76 Civ. 2125, 2005 WL 736146, at *5 (S.D.N.Y. Mar. 31, 2005), to support this position.  The court is not persuaded.  *Williamsburg* involved a matter resolved by a settlement agreement which was so ordered by the court.  The mere fact that the court so ordered the agreement, however, was not enough to bestow prevailing-party status on the plaintiffs.  *See Williamsburg Fair Housing*, 2005 WL 736146, at *5 (*citing Torres v. Walker*, 356 238 F.3d, 244 (2d Cir. 2004).  Rather, the court there examined whether the court had placed a sufficient "judicial imprimatur" on the settlement.  It found such an imprimatur in a host of facts, including the court's participation in multiple conferences leading to the settlement, its review of the settlement, and its conduct of a fairness hearing concerning the settlement  terms.  In addition, the court pointed to the fact that the settlement contained obligations beyond the power of the parties to perform, and could be enforced only by

_____

[4]Although the defendants seek to characterize the settlement stipulation as a consent decree, it has none of the characteristics of a consent decree.  For one thing, it was not entered with the consent of the parties.  More importantly, it did not result in any ongoing duty by either party to engage in, or to refrain from engaging in, some prescribed conduct, subject to review by the court.  *Compare, e.g., with consent decrees described in Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008); *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 283 (2d Cir. 2008); *United States v. N.Y.C. Dist. Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters and Joiners of Am.*, 229 Fed. Appx. 14, 2007 WL 1157143 (2d Cir. 2007); *Doe v. Pataki*, 481 F.3d 69, 73-74 (2d Cir. 2007); *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999).

the court. *Id.*, at *6-7. The settlement stipulation here carries none of these hallmarks. The court had no involvement in its negotiation, never reviewed the terms, and has no role to play in its enforcement.[5] Moreover, other than resolving the dispute between the parties, the agreement does not alter the relationship between the parties in any way as required by *Buckhannon*.

Finally, the defendants contend that according to the terms of the settlement stipulation the plaintiffs agreed that the defendants are prevailing parties. The language they rely on is found in paragraph three of the stipulation which states,

> Defendants may move pursuant to 17 U.S.C. § 505 for recovery of their costs including reasonable attorneys fees incurred in connection with their defense of this action as the prevailing party, which motion may be opposed by the plaintiffs.

Shapiro Aff. ¶ 55, Exh. G. They argue that the phrase "as the prevailing party" constitutes a concession by the plaintiffs that the defendants have that status. The principal difficulty with the argument is that the language upon which the defendants rely is ambiguous. An equally plausible reading of paragraph three is that the defendants' motion under the statute may proceed based on the *assertion* that they are the prevailing party, not on the plaintiffs' *concession* that they are the prevailing party. Such a reading is consistent with the last phrase in the paragraph stating, "which motion may be opposed by the plaintiffs." Since the defendants drafted the settlement stipulation, the ambiguity should be construed against them. *E.g., Herrera v. Katz Communications, Inc.*, 532 F. Supp. 2d 644, 647 (S.D.N.Y. 2008) *(citing Andy Warhol*

---

[5]The defendants seek to characterize the court's role in deciding the instant motion as "enforcement" of the settlement stipulation. That characterization stretches the meaning of "enforcement" beyond any rational definition. Enforcement of an agreement by the court contemplates the existence of an obligation created by the agreement, the performance of which the court is asked to compel. Here, there is no such obligation, only the opportunity reserved to the defendants to make an application to the court. Only if the application is granted does an obligation arise. But that obligation would be created by the court's order, not by the settlement agreement.

*Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999)). This is particularly true here since the plaintiffs never agreed to the specific language used in the settlement stipulation, and there is no evidence that the specific language of paragraph three was even the subject of discussion among counsel.

Put simply, the defendants here are not prevailing parties within the meaning of the Copyright Act and therefore are not entitled to an award of fees under that Act.

### B.     SANCTIONS UNDER 28 U.S.C. § 1927

The defendants next argue that they are entitled to an award under the following statute which permits federal courts to award attorney's fees as a sanction for certain types of egregious conduct in litigation:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

In countering this argument, the plaintiffs seek to rely on language in the same paragraph three of the settlement stipulation which the defendants advanced in support of their argument in the previous section of this opinion. The plaintiffs argue that since that paragraph only refers to the fee-shifting provision of the Copyright Act, the defendants may not rely on some other statute or basis (such as the court's inherent authority addressed in the next section) as authority for an award of attorney's fees. Although it is true that paragraph three refers to only one basis for a fee award, no language in that paragraph or elsewhere in the agreement purports to limit the defendants' rights in any way other than to dismiss their counterclaims with prejudice. Thus,

the fact that the defendants specifically reserved to themselves the right to base a fee award on the Copyright Act does not serve to limit their right to make an application for fees on some other basis.

However, the plain, unambiguous language of section 1927, which is entitled "Counsel's liability for excessive costs," makes clear that the statute is designed to impose sanctions upon attorneys for improper behavior during litigation. Thus, sanctions under section 1927 are to be imposed exclusively against offending attorneys, not their clients. *Wood v. Brosse U.S.A., Inc.*, 149 F.R.D. 44, 48 (S.D.N.Y. 1993), *citing Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986), *cert. denied*, 480 U.S. 918 (1987). Here, it is the conduct of the plaintiffs themselves, not the conduct of their attorneys, that the defendants principally cite as the basis for their claim for attorney's fees. As explained more fully below, the frivolousness of the plaintiffs' claims, as proved by serious (indeed fraudulent) discrepancies in documents that came to light during the plaintiffs' deposition, is at the heart of the defendants' claims that the action was undertaken in bad faith. In fact, as the defendants themselves point out, promptly upon learning of the serious flaws in the plaintiffs' claims, the plaintiffs' attorneys sought to end the litigation. Shapiro Aff. ¶ 46. Consequently, since section 1927 serves as a basis for sanctions only against attorneys, not parties, it does not authorize an award of fees and costs for the misconduct complained of here.

C.    THE COURT'S INHERENT AUTHORITY

The final basis for an attorney's fee award suggested by the defendants – the court's inherent authority – provides a viable basis for their claim. In *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50 (1991), the Supreme Court established that courts have the "inherent power to impose attorney's fees as a sanction for bad-faith conduct," and this sanction can be imposed

directly on the parties. "A court must, of course, exercise caution in invoking its inherent power," but in cases when "neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* Sanctions under the court's inherent power are appropriate when a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46 (*quoting Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975)). This is the case when a party's "entire conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court," *id.* at 51, 111 S.Ct. 2123, and when a party attempts through "tactics of delay, oppression, harassment and massive expense to reduce [their adversary] to exhausted compliance." *Id.*, 421 U.S. at 41.

In this Circuit, a party must make "a particularized showing of bad faith to justify the use of the court's inherent power." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991). The Second Circuit has declined to uphold sanction awards absent both " 'clear evidence' that the challenged actions 'are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes' " and "a high degree of specificity in the factual findings of [the] lower courts." *Id* at 1345 (*quoting Oliveri*, 803 F.2d at 1273). In addition a "prevailing defendant is entitled to an award of attorney's fees if a plaintiff brings or maintains an action without adequate factual basis and in bad faith." *Nemeroff v. Abelson*, 704 F.2d 652, 654 (2d Cir. 1983). However, courts should take heed when applying this rule "that plaintiffs are not deterred from suing to enforce their rights, especially when enforcement of those rights vindicates the Constitution or the acts of Congress." *Id.* Sanctions should thus be imposed only in "unusual circumstances" in order to ensure that "[p]laintiffs who have a colorable basis for a claim and

who act in good faith need not apprehend that defeat on the merits of their lawsuit will require them to pay their adversaries' legal fees." *Id*. at 660. A claim is "colorable" "as long as a reasonable attorney could have concluded that facts supporting the claim might be established." *Id*. at 658.

The plaintiffs' production in discovery of two documents purporting to be copyright registrations, but which proved to be fraudulent, convince the court that by the time of the plaintiff Gavrilov's deposition the plaintiffs were pursuing their claims in bad faith. In the months before that deposition, which commenced in October 2006, the plaintiffs had dragged their feet in providing documents requested by the defendants in discovery. Indeed, it took a court order before the plaintiffs produced documents in the summer of 2006 that purported to establish the date of copyright registrations applicable to the work allegedly infringed by the defendants. Shapiro Aff. ¶¶ 30-35.[6] Although the plaintiffs' claims rested in large part on allegations of copyright infringement, prior to that document production no documents reflecting the actual registration of any copyrights in the work had been furnished to the defendants. The only documents relating to the purported copyright registrations that had been produced were photocopies of an application seeking copyright registration for the motion picture. That application, which was annexed as Exhibit 1 to the plaintiffs' Complaint, was dated December 1, 2003 and was apparently mailed to the Copyright Office on January 4, 2005. *See* Complaint (marked as Def't's Ex. I).

---

[6]The affirmation was offered in lieu of direct testimony at the evidentiary hearing on the motion; the plaintiffs were offered the opportunity to cross-examine Shapiro at the hearing but declined. Tr., Dec. 18, 2008, pp. 32-33. Exhibits A through H to the Shapiro Affirmation thus became part of the record of the evidentiary hearing; additional exhibits I through L were offered through the testimony of witnesses.

The plaintiffs' document production in the summer of 2006 included photocopies of two documents that appeared to reflect actual registrations of copyrights in the motion picture.[7] Copies of the purported registrations produced by the plaintiffs are annexed as Exhibits B and C to the affirmation filed by the defendants' attorney in connection with this motion. Shapiro Aff. Exs. B, C. One of the two, Exhibit B, was an exact duplicate of the application annexed to the plaintiffs' complaint, but with what appeared to be a handwritten inscription by the Copyright Office reflecting issuance of a copyright registration on January 19, 2005. Testimony and events at the deposition of Gavrilov demonstrated that Exhibit B was not genuine, however. As noted earlier, the defendants had asked for the originals of the copyright registrations to be produced at the deposition, and when Gavrilov arrived without them the defendants' counsel suspended the deposition and insisted that he retrieve them from his office. When Gavrilov returned from his office to the site of the deposition, he produced only one original document; it was not the same as either Exhibit B or Exhibit C. Indeed, Gavrilov has never produced originals of those two photocopies of purported copyright registrations. Rather, the original document he produced at the deposition was an entirely different document reflecting a copyright registration date of May 10, 2005. The effective date of the copyright is significant, because a plaintiff may not recover statutory damages and attorney's fees unless the copyright was registered with the Copyright Office at the time of infringement, and the infringement alleged here occurred long *before* May of 2005.

---

[7]The Copyright Office provides an applicant with proof of the registration by returning to the applicant a copy of the application that was submitted by the applicant with a Certificate of Registration affixed in the upper right hand portion of the first page of the application bearing a registration number and the effective date of the registration.

Even more troubling is a discovery made by the defendants' counsel concerning the registration that is marked as Exhibit C. Exhibit C is a photocopy of the first page of a two-page copyright application form for "Spy Games," the work allegedly infringed, with a registration number and effective date affixed in the upper right hand corner purporting to reflect that the copyright registration had occurred on December 26, 2003. When the defendants' counsel performed a search of Copyright Office records concerning the registration number that appears on Exhibit C, however, he discovered that the registration number relates, not to "Spy Games," but to an entirely different motion picture entitled "NMX" for which the plaintiff Gavrilov had obtained a copyright registration in the year 2000.[8] Shapiro Aff. ¶ 42 & Ex. D. It is obvious, then, that Exhibit C is a "cut and paste" forgery by the plaintiffs, created for the purpose of misleading the defendants, and ultimately the court, into believing that the plaintiffs possessed a registered copyright for "Spy Games" dating back to 2003. The conclusion is inescapable that the plaintiffs produced phony photocopies of copyright registrations for the work alleged to be infringed in this case in order to fraudulently mislead the defendants and the court about facts essential to their claims.

The plaintiff Gavrilov tried to explain away the phony documents in a declaration submitted in connection with this motion in which he asserts that he did not personally prepare copyright applications. Rather, an assistant in his office prepared them based on drafts and markups created (apparently by Gavrilov) to give guidance to his assistant. Gavrilov says he

---

[8] The defendants' counsel asserts that Gavrilov testified at his deposition that Exhibit C was a genuine copy of a copyright registration for the screenplay for "Spy Games." Shapiro Aff. ¶ 41. Exhibit C itself, however, describes the nature of the work as a "motion picture," not a screenplay, and the nature of authorship as "producer and director," not writer.

produced all his records in discovery, including the drafts, and may have misidentified some of the drafts at his deposition. Gavrilov Dec. ¶¶ 4, 6-7 (annexed as Exhibit B to the Declaration of David Hoffman). Gavrilov did not offer this testimony at the hearing on this motion, and his declaration was not offered in evidence, so the evidentiary value of these assertions is suspect. Whatever their evidentiary significance may be, however, they provide no credible explanation concerning the creation of Exhibit C, because there would be no reason to affix a copyright registration certificate to a draft or mark-up of a copyright application that was to be submitted to the Copyright Office. The effort to explain away the forgery in this manner only further convinces the court of the plaintiffs' fraudulent intent.

Finally, other testimony and another document produced at Gavrilov's deposition provides additional support for the conclusion that, by the time of the deposition, the plaintiffs were maintaining this action in bad faith. At the deposition the plaintiffs produced for the first time a Russian language contract that granted an exclusive license to the plaintiff Permanent Residence, Inc. to duplicate and sell DVD copies of the work at issue here in the United States. Shapiro Aff. ¶ 43. (The Russian version and an English translation are found at Shapiro Aff. Ex. E.) The contract is dated April 14, 2005 and conveys those rights for a one-year period from March 15, 2005 through March 14, 2006. Shapiro Aff. Ex. E, ¶ 1.3. Gavrilov admitted in his deposition that the agreement was not finalized until April 2005. The plaintiff Permanent Residence, Inc. thus did not have exclusive rights to market the DVD's at the time of the alleged infringement by the defendants in January of 2005, and therefore had no standing to bring an action for that alleged infringement. This, coupled with the revelation that the copyright registration had not issued until May 2005, led the plaintiffs' counsel to concede at the

termination of Gavrilov's deposition that the plaintiffs' claims lacked merit and that the action should be dismissed. Shapiro Aff. ¶ 46.

The record is not sufficient for the court to conclude that when this action was commenced the plaintiffs were acting in bad faith. There is evidence that the plaintiffs were in negotiations for rights to the work in question before the alleged infringements took place and that they made actual efforts to obtain copyright registrations for the work in January before the action was commenced. By the time they produced the phony documents discussed above, however, it must have become known to them that their claims could not be sustained without creating those phony documents. The court thus concludes that the plaintiffs were maintaining this action in bad faith at least as early as the time when they produced the phony documents, which appears to have occurred in July or August of 2006, and that pursuant to its inherent power the court should award the defendants their fees and expenses from that point forward through to the end of this litigation.

## D.    ATTORNEY'S FEES AND COSTS

The Second Circuit has adopted the "lodestar" approach in determining what constitutes a reasonable attorney's fee. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998). The so-called 'lodestar' figure is calculated "by multiplying the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)(internal quotations omitted)). This assessment "should be based on 'prevailing market rates,' for comparable attorneys of comparable skill and standing in the pertinent legal community," *id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)), which, here, is the Eastern District of New York, *Pinner v. Budget Mortgage Bankers, Ltd.*, 336 F. Supp. 2d 217, 220

(E.D.N.Y. 2004).  To aid the court in determining the amount of reasonable attorney's fees, the plaintiff is required to submit evidence that provides a factual basis for a fee award.  *Hensley,* 461 U.S. at  433-434.  In this Circuit, that entails submitting contemporaneous billing records documenting the date, the hours expended, and the nature of the work done, for each attorney.  *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148, 1154 (2d Cir. 1983).  The court must then determine whether the "requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum v. Stenson,* 465 U.S. at 896 n.11; *Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir. 1997).  Where adequate records are not submitted, the court may deny fees altogether or reduce the award.  *See Carey,* 711 F.2d at 1148; *Private Sanitation Union Local 813, Int'l Bhd. of Teamsters v. Gaeta-Serra Associates, Inc.*, Dkt. No. CV 02-5526, 2005 WL 2436194, at *3-4 (E.D.N.Y. Aug. 12, 2005).  In addition, the court may exclude hours from the lodestar calculation that it finds to be excessive, duplicative, or unnecessary.  *Duke v. County of Nassau,* 2003 WL 23315463, at *1 (E.D.N.Y. Apr. 14, 2003), *citing Hensley,* 461 U.S. at 434, *Luciano*, 109 F.3d at 116.

In connection with their application for attorney's fees and cost, the defendants have submitted copies of all of the invoices submitted to the defendants for legal services rendered in connection with this action.  *See* Shapiro Aff. Ex. H.  The invoices were prepared by the defendants' counsel and contain detailed listings of the dates on which legal services were rendered, a description of the services rendered, the time spent in connection with each item of service, the hourly rate charged, and the total amount charged for each item of service.  These records are more than adequate to meet the standards for establishing a proper factual basis for a

fee award through contemporaneous billing records.  The court has examined the records and finds that the time spent on the various tasks was appropriate and that no work was unnecessary or duplicative.  Two attorneys performed services.  The time of the lead attorney Mr. Shapiro, who has over 30 years of experience in the practice of law primarily in the area of intellectual property, was charged at the rate of $275 per hour.  His associate Walter-Michael Lee, a 2003 law school graduate, performed services initially at the rate of $175 per hour, and at the rate of $190 per hour commencing in September of 2007.  Those rates are well within the usual and customary rates for attorneys with their respective levels of experience in this legal market.  The invoices also disclose certain out-of-pocket expenses for translation and interpretation services in connection with Gavrilov's deposition and the Russian language contract described above. These expenses should also be reimbursed.

The invoices for services rendered and expenses incurred after August 2006 disclose the following charges:

| Date of Invoice | Amount of Charges |
|---|---|
| December 22, 2006[9] | $   6,908.33 |
| March 2, 2007 | 10,627.66 |
| April 20, 2007 | 2,822.08 |
| June 23, 2007 | 10,904.67 |
| November 8, 2007 | 508.34 |
| December 18, 2007 | 2,708.34 |
| February 4, 2008 | 165.00 |
| February 12, 2008 | 7,032.17 |
| **TOTAL** | $ 41,676.59 |

*See* Shapiro Aff. ¶74.

_____

[9]This invoice reflects billings commencing in September 2006.

The plaintiffs attack specific entries in the invoices as being non-compensable on a variety of grounds. Many of the entries they cite, however, relate to time periods before August 2006 and are thus not included in the calculation above. Of the remaining entries, the plaintiffs challenge five that relate to discussions and memoranda concerning strategy on the grounds that they are excessive. The entries range in time from four-tenths of an hour to three-quarters of an hour, however, which is clearly not excessive in overall time, and in any event amount to only slightly more than $600 in fees. The plaintiffs also point out three entries that they contend relate to a different action that they have filed against the defendants. They are correct that two of the three they have identified appear to relate to the other action – specifically entries dated 3/15/07 and 3/21/07 for charges totaling $558.75 – and that amount should be subtracted from the total set forth above. Finally, the plaintiffs argue that the amount of time devoted to research and preparation of the fee application was excessive given the experience of the defendants' lead counsel in making fee applications pursuant to the Copyright Act. The court disagrees. First, the amount of time spent on the fee application totaled approximately 26 hours, most of which was attributed to the work of the associate. In addition, the fee application was not a typical application since it did not rest solely on the Copyright Act, but on two additional grounds not customarily relied upon for fee applications, which thus required fresh research and writing and not simply reliance on previous "boilerplate." Given those considerations, the amount of time spent on the application is reasonable.

After making the minor deduction for work on a different matter as set forth above, the reasonable attorney's fees and expenses for which the plaintiffs should be held responsible to the

defendants for having maintained their action against the defendants in bad faith after August 2006 totals $41,117.84.

## CONCLUSION

For the foregoing reasons, I recommend that the defendants' motion for an award of attorney's fees and expenses be granted, and that pursuant to the court's inherent power the plaintiffs should be ordered to pay to the defendants a total of $41,117.84 for the attorney's fees and expenses unnecessarily incurred by the defendants during the period of time when the plaintiffs were maintaining this action in bad faith.

\* \* \* \* \* \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:　Brooklyn, New York
　　　　July 28, 2009